OPINION OF THE COURT
Phillip R. Rumsey, J.
Petitioner’s daughter Wendy, who was married to respondent, was found dead in her home on or about May 26, 2008. Her *632 death is being investigated as a homicide. Petitioner asks that she, rather than respondent, be granted permission to determine the disposition of her daughter’s remains.* Petitioner asserts that Wendy would have preferred that her body be laid to rest in Towanda, Pennsylvania, where she grew up, and where her father is buried. Respondent contends that Wendy would have wanted to be cremated and have her ashes scattered on the property where she had lived with respondent and their 17-year-old son.
The governing statute is Public Health Law § 4201, which sets forth a prioritized list of those who shall presumptively have the right to direct the disposition of a decedent’s remains, beginning with an individual designated by the decedent in a written instrument executed pursuant to the same statute. If there is no such written instrument, the decedent’s “surviving spouse” is next on the list, followed by his or her domestic partner, children who have reached the age of 18, and then parents (Public Health Law § 4201 [2] [a]). The statute further provides that if a listed individual
“is not reasonably available, unwilling or not competent to serve, and such person is not expected to become reasonably available, willing or competent, then those persons of equal priority and, if there be none, those persons of the next succeeding priority shall have the right to control the disposition of the decedent’s remains” (Public Health Law § 4201 [2] [b]).
In support of her request, petitioner alleges, inter alia, that Wendy and respondent were “estranged” and “separated” (petition ¶¶ 3, 6), and that Wendy feared and loathed respondent (id. ¶ 15), against whom she had commenced a divorce action. The petition is supported by documents relating to an incident that allegedly occurred on April 14, 2008, after which Wendy reported to the police that respondent had attacked and strangled her to the point of unconsciousness, and obtained an order of protection directing respondent to stay away from her (petition, exhibit A).
Certain of petitioner’s allegations are denied by respondent in his verified answer, including the claims that the parties were *633 separated and estranged. Respondent further asserts that he lacks information sufficient to form a belief as to whether Wendy would have “not want[ed] her body to be released to respondent for burial under any circumstances” (petition 1Í10; answer 11 5). Finding that these denials raised material factual questions, the court conducted an evidentiary hearing on the issues of whether the decedent and respondent were estranged or separated, such that respondent should not be considered to have been the decedent’s “surviving spouse” within the meaning of the governing statute, and whether petitioner and respondent, respectively, are “competent” to carry out Wendy’s wishes with respect to the disposition of her remains. At the hearing, the parties stipulated that Wendy had commenced a matrimonial action, which remained pending until her death; that Wendy and respondent had been living separately; that there was an order of protection in place; that respondent had been arrested for the acts alleged by Wendy in a sworn statement given to the police on April 15, 2008; and that the resulting criminal action is still pending.
There is no written instrument executed pursuant to the statute. The parties concede that the document signed by Wendy and respondent in 1992 (more than 12 years prior to enactment of the statute), with a title that begins “THIS IS THE LAST WILL” (hearing exhibit A), may not be a will entitled to probate. Nor does that document, which was unwitnessed, but for the signature and stamp of a notary public, without a statement of acknowledgment or jurat, “substantially” comply with the statutory format for appointment of an agent to control the disposition of a person’s remains after death. Nevertheless, it does appear to encompass some written expression by Wendy of what should occur upon her death, and should be considered to the extent that it may provide an indication of what her wishes were, at least when it was executed.
The only applicable provision, section 3 (at 11) — which, according to the express terms of the document, was intended to be effective if Wendy predeceased both respondent and their son — is silent concerning the disposition of her remains, although it does provide that respondent be “executor.” The document as a whole is sometimes written from a plural perspective (we), and sometimes from a singular perspective (I, my). When in the latter format, it is clear that the author was nearly always respondent. Interestingly, the section intended to take effect on Wendy’s death (§ 3) is extremely brief (compared to *634 the other sections), and only sets forth provisions that benefit respondent (e.g., bequeathing all of Wendy’s possessions to respondent, and naming him executor). While section 1 of the document (intended to apply if the entire family were to die at the same time) does contain an expression of intent that they all be buried on the property in Cortlandville, the court is not persuaded — in view of the overall tenor and structure of the document — that this is necessarily what Wendy would have wanted to be done with her own remains, in the event she were survived by respondent and their son.
Even were the court not to find the document itself suspect, however, given the series of events that transpired in the months preceding Wendy’s death, and the extant circumstances at the time she died, the court would not be inclined to afford a “Last Will,” written some 16 years earlier, entitled to much, if any, weight, in discerning Wendy’s “moral and individual beliefs and wishes” regarding the disposition of her remains (Public Health Law § 4201 [2] [c]), or in determining whether respondent should be deemed a competent surviving spouse, within the meaning of Public Health Law § 4201.
Although the statute does not define “surviving spouse,” there is no indication that the Legislature intended to change the meaning of that term as established by prior case law, which held that it does not encompass those who were separated or estranged from their partners at the time of death (see Feller v Universal Funeral Chapel, Inc., 124 NYS2d 546, 550 [1953]; cf. Matter of Salomon, 196 Misc 2d 599, 600 [2003]; Matter of Forrisi, 170 Misc 649, 650 [1939]). Nor is the term “competent” defined in the statute, but given the apparent legislative intent that a decedent’s directions and wishes be honored insofar as practicable, it seems reasonable to consider a person’s ability and willingness to carry out those wishes, to the extent they are known, when assessing “competency.” Bearing in mind those principles, the court finds that the hearing testimony most strongly supports petitioner’s position.
Respondent’s sister, Patricia Allison, testified that for many years she maintained a close relationship with Wendy, and that Wendy had told her, within the last five months, that she would like to be buried on her Cortlandville property with her dog. During the December 2007 holidays, Wendy also revealed to Allison that she and respondent were not “on the best of terms,” that she was “unhappy,” and that she “wanted to be able to be herself and not what someone else wanted her to be.” By *635 Memorial Day weekend (May 24-26, 2008), however, Allison believed that there had been some improvement in the couple’s relationship.
The court discounts Allison’s view of the decedent’s marital relationship, which is in stark contrast to Wendy’s recent actions (e.g. asking friends to stay with her because of a fear that respondent would return to the home and attempt to do her harm), as well as numerous statements she made to her sister, Lori Monahan; her mother, petitioner herein; her sister-in-law, Mary Ellen Maurer; and hometown friends and neighbors, as reported by each of these individuals. Wendy was clearly far more than merely “unhappy” with respondent on April 15, 2008, when she signed a statement, under penalty of perjury, outlining the basis of her fear of dying by his hand hours earlier. And, it appears that Wendy shared her concerns, fears and wishes more openly with friends and other family members, than with Allison.
Wendy’s close friends and relatives testified, consistently and convincingly, that Wendy had repeatedly told them that she was “afraid” of respondent, and did not want to stay alone after April 14th, out of fear that he would return and attempt to harm or even kill her. Lori Monahan, Wendy’s sister, recounted a conversation she had with Wendy on May 25, 2008, in which Wendy said that she “hated” and “loathed” respondent, and would “never” again go upstairs or sleep in the former marital bed. Wendy was also reported to have expressed, on that day, her belief that respondent “intended to kill me.” Wendy’s sister-in-law and petitioner both told of a meeting they had with Wendy in Binghamton in late April, when she had told them of the events of April 14th, and of her fears resulting from that incident, and had expressed that she wanted to “come home” to Towanda, but could not because of her parental responsibility.
Several friends testified about conversations they had with Wendy in which she had expressed her dislike of respondent, and her fear that he intended to harm her. Francine Davis reported Wendy’s statements that her relationship with respondent “was over,” that she “didn’t want any contact with him,” and that she was afraid that respondent would come and hurt her again. Francine also recounted that Wendy had repeated five or six times, on the telephone, “I hate him,” referring to respondent. Francine’s husband explained that he had heard Wendy say that although she loved her son, her relationship with him was troubled and somewhat fearful, and she did not *636 want custody of him, and did not want to remain in the home she had shared with respondent and their son, but just “wanted out” of the relationship.
Petitioner testified that she seeks the court’s permission to take her daughter’s remains to her home in Towanda, where Wendy can be buried in the family plot with her father. She recounted conversations in which Wendy had spoken of her growing fear of respondent and of staying in her home, and of one exchange on Memorial Day weekend when Wendy had spoken of going home to Towanda, buying a house there, and taking horseback riding lessons.
In addition to these family members and friends, a family friend from Pennsylvania, David Adiska, who first met Wendy on May 25, 2008, testified about a conversation he had with her that day, when she had confided that she was “very scared,” “felt hunted,” and “needed to get out of the relationship” with respondent, and that every minute she was watching over her shoulder, knowing that respondent “is trying to kill me.”
The testimony of these witnesses, taken together, provides ample evidence of Wendy’s feelings about respondent, and of the state of their relationship, at the time of her death. There can be little doubt that Wendy and respondent were both “separated” and “estranged,” in every practical sense of those words. Wendy did not want to be with respondent, did not like him (in fact, she expressed on many occasions, to several individuals, that she “hated” him), did not want to remain married to him, and did not in any way want to continue to share her life with him. She had “separated” herself from him even further than merely choosing to live in a separate dwelling, by seeking and obtaining an order of protection that required him to stay away from her, and from their former marital residence, where she was living. Regardless of whether the allegations and averments that she made in support of her application for the order of protection were true, it is abundantly clear that decedent disliked respondent, and was afraid of him, to a sufficient extent to prompt her to take this drastic action to ensure that he would stay away from her at all times. If this couple was not “estranged,” the word has no meaning.
Accordingly, respondent cannot be considered to have been decedent’s “surviving spouse” at the time of her death. This comports with the intent of the relatively new statute governing the disposition of remains — which is to effectuate the “moral and individual beliefs and wishes” of the decedent — as the *637 degree of Wendy’s animosity toward respondent provides a strong indication that she would not have wanted him to have control over her remains after death.
Moreover, even presuming that respondent is completely innocent of all charges and free from culpability with respect to all of the allegations made by Wendy prior to her death, the court finds that her frame of mind, for several months prior to her death, is best characterized as a lack of confidence in any personal relationship or sharing of any important and personal communications with respondent. It is, however, clear that she did share personal concerns, fears, and information with family members and close friends during this period of time. This provides further indication that Wendy would have wanted one of these individuals, such as her mother, to have control of her remains, and would not have wanted respondent to be given that responsibility.
In sum, petitioner has met her burden of demonstrating that she is the proper individual to control the disposition of her daughter’s remains, because there is no written instrument executed pursuant to the statute, respondent is not a “surviving spouse” for these purposes, decedent had no domestic partner or child age 18 or older, and she is decedent’s surviving parent. Even were respondent to be viewed as a “surviving spouse,” his insistence on having Wendy’s body cremated and scattered on the property where he will presumably continue living, even in the face of her clear wish not to continue a relationship with him, and her overriding fear of him and consequent desire to not be near him, renders him “incompetent” to control her remains, as he is apparently unwilling to act in conformance with her wishes and desires in that regard. There being no compelling proof that petitioner is not competent, willing and able to carry out her daughter’s recently expressed desire to “return” to Towanda, Pennsylvania, the petition is granted, and the Cortland County Coroner is directed to release Wendy’s remains to, or at the direction of, petitioner alone.
This amended decision, which supercedes the original decision, order and judgment dated June 10, 2008, nunc pro tunc, shall constitute the order and judgment of the court.

 The Cortland County Coroner, who is presently in possession of Wendy’s remains, has not been named as a party herein, but has been provided notice of the proceeding and an opportunity to participate. The coroner takes no position with respect to which party should be appointed to control the disposition of the remains, but has expressed (through the County Attorney) his willingness to abide by any determination of the court in that regard.