OPINION OF THE COURT
Arlene P. Bluth, J.
Where a human being wishes to be buried is a deeply personal, and often spiritual, decision. Whatever the motivation for that particular location, a decedent’s survivors must strive, to the extent practicable, to fulfill the decedent’s wishes. Ultimately, the wishes of the deceased must prevail over the survivors’ own preferences.
This proceeding asks this court to determine if there are good and substantial reasons for moving Ms. Frieda Leszkowitz’s final resting place from Queens, New York to Jerusalem, Israel. The court must offer its opinion because Ms. Leszkowitz’s *666 family disagrees about where she wanted to be buried. After reviewing the parties’ papers, the court found that petitioner, Lucy Lipiner, had standing to bring this proceeding and ordered that an evidentiary hearing was required to resolve issues of fact and credibility. This evidentiary hearing was held on October 19-20, 2016.
Frieda Leszkowitz was petitioner’s older sister. They and their parents survived the Holocaust. Their parents are buried in Israel. Frieda’s children have not lived in New York for many years. David is a doctor in Michigan and Shelly lived in Michigan until she retired and moved to Florida. Unfortunately, Ms. Leszkowitz, who had bouts with cancer and severe diabetes, was not in good health for several years prior to her death. Petitioner lived only a few blocks from Ms. Leszkowitz’s apartment in Manhattan and petitioner helped Frieda with her daily needs. Among many other things, petitioner had a joint bank account with Ms. Leszkowitz, found home health aides when needed and made sure Ms. Leszkowitz made and attended her doctor’s appointments. By all accounts, petitioner was a devoted sister and, at the hearing, David expressed gratitude for everything his aunt did for his mother.
Ms. Leszkowitz’s family, just like every family, has had many disagreements—some of which have lingered for decades. This court does not endeavor to make findings about the strengths and weaknesses of the relationships discussed during the evidentiary hearing. No one should view this court’s decision as tantamount to taking sides in this family’s disagreements. The court does not question that Ms. Leszkowitz’s family, including her children, David and Shelly, and her sister, Ms. Lipiner, loved and cared for Ms. Leszkowitz. This decision is not about who loved Ms. Leszkowitz more, or whom she loved more when she was alive. Rather, this case compels the court to decide where she wanted to be buried.
Discussion
“The quiet of the grave, the repose of the dead, are not lightly to be disturbed. Good and substantial reasons must be shown before disinterment is to be sanctioned” (Matter of Currier [Woodlawn Cemetery], 300 NY 162, 164 [1949] [citations omitted]).
“While the disposition of each case is dependent upon its own peculiar facts and circumstances and while no all-inclusive rule is possible, the courts, exercising a benevolent discretion, will be sensitive *667 to all those promptings and emotions that men and women hold for sacred in the disposition of their dead” {id. [citations and internal quotation marks omitted]).
“And looming large among the factors to be weighed are the wishes of the decedent himself” {id.). “The dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose” (Yome v Gorman, 242 NY 395, 403 [1926]).
“If a person designated to control the disposition of a decedent’s remains, pursuant to this subdivision, is not reasonably available, unwilling or not competent to serve, and such person is not expected to become reasonably available, willing or competent, then those persons of equal priority and, if there be none, those persons of the next succeeding priority shall have the right to control the disposition of the decedent’s remains” (Public Health Law § 4201 [2] [b]).
Public Health Law § 4201 (2) (c) compels “[t]he person in control of disposition, pursuant to this section,” to “faithfully carry out the directions of the decedent to the extent lawful and practicable” and “in a manner appropriate to the moral and individual beliefs and wishes of the decedent.”
“Sparse case law exists interpreting the recent enactment of Public Health Law § 4201 which, inter alia, prioritizes the persons authorized to control a decedent’s remains, and immunizes entities such as funeral homes, cemeteries, and crematories from civil liability for their good faith disposal of human remains upon the direction of a person enumerated in and prioritized by Public Health Law § 4201 (2) (a)” (Mack v Brown, 82 AD3d 133, 135 [2d Dept 2011]).
One court has held that competence pursuant to Public Health Law § 4201 (2) (b) means a willingness “to act in conformance with [the deceased’s] wishes and desires” (Maurer v Thibeault, 20 Misc 3d 631, 637 [Sup Ct, Cortland County 2008]). The term competent is not defined in the Public Health Law, “but given the apparent legislative intent that a decedent’s directions and wishes be honored insofar as practicable, it seems reasonable to consider a person’s ability and willingness to carry out those wishes, to the extent they are known, when assessing ‘competency’ ” (id. at 634).
*668 Applying the foregoing principles, the court finds that there are good and substantial reasons to move Ms. Leszkow-itz’s remains to Israel. The testimony of Ms. Leszkowitz’s two home health aides, Ms. Houston and Ms. Ward, establishes that Ms. Leszkowitz expressed a clear desire to be buried in Israel. These two aides testified that they worked for Ms. Lesz-kowitz from June 2015 until her death in July 2016. The aides testified that their regular work schedule entailed at least one of them working with Ms. Leszkowitz every day from 9:00 a.m. to 6:00 p.m., and the aides testified that they continued to appear for their shifts even when Ms. Leszkowitz was hospitalized in November 2015 and in a rehabilitation facility in December 2015. Ms. Ward also testified that on certain occasions when Ms. Leszkowitz was not feeling well, she would stay overnight at Ms. Leszkowitz’s apartment.
Both Ms. Ward and Ms. Houston testified that they had conversations with Ms. Leszkowitz where she described her desire to be buried in Israel with her mother and father. Ms. Ward further testified that Ms. Leszkowitz never spoke about wanting to be buried next to her ex-husband in Queens and that Ms. Leszkowitz never had a kind word about her ex-husband. In fact, Ms. Ward testified that Ms. Leszkowitz felt that her ex-husband treated her poorly and was a “bastard.”[1] Respondents did not supply any reason why these two aides, who have no involvement with the family disputes that were discussed at length during the hearing, should not be believed.[2]
There was no evidence presented to suggest that Ms. Ward and Ms. Houston stand to gain financially or in any other way *669 by testifying that Ms. Leszkowitz wanted to be buried in Israel. These two witnesses provided the only independent accounts of Ms. Leszkowitz’s final wishes, untainted by years of family resentments. Their only motivation was to inform the court about their conversations with Ms. Leszkowitz and they testified clearly and credibly. Accordingly, the court finds these witnesses’ testimony to be credible and their testimony provides good and substantial reasons why Ms. Leszkowitz’s remains should be moved to Israel: because that is where she said she wanted to be buried.
As the court expressed during the hearing, the testimony of the other four witnesses touched on decades-old family disputes or accounts of Ms. Leszkowitz’s life dating back to World War II and the early days of her marriage in the 1950s. Petitioner, Ms. Katz (petitioner’s daughter), David, and Shelly[3] clearly had agendas motivating their testimony other than determining the final wishes of Ms. Leszkowitz. This court is not interested in deciding, for example, whether or not David was present at the death of his uncle Eddie or whether certain relatives received invitations to Shelly’s grandson’s bar mitzvah. This does not mean that the court finds this testimony or those past events to be meaningless; it simply means that those issues are not relevant to this court’s analysis regarding where Ms. Leszkowitz wanted to be buried.
Critically, David and Shelly’s testimony regarding their mother’s burial wishes focused primarily on what they thought their mother would say or do rather than what she actually said. While David and Shelly may have sincerely believed these things about their mother, they do not constitute personal and direct knowledge concerning Ms. Leszkowitz’s burial wishes. Other than a single conversation that David claims he had with his mother in June 2015, respondents did not provide any other witness testimony or documentary evidence to directly refute petitioner’s claim that Ms. Leszkowitz wanted to be buried in Israel.
David’s recollection of a conversation he had with his mother in June 2015 constitutes the only evidence respondents offered to counter petitioner’s claim that Ms. Leszkowitz wanted to be buried in Israel. The court finds that this conversation, even if *670 it did occur,[4] predated Ms. Leszkowitz’s conversations with the two home health aides. David’s testimony is not sufficient to defeat the credible testimony of the two home health aides who were with his mother full time for more than a year after that alleged conversation.
Two Cemetery Plots: One in Israel and One in Queens
After Shelly was born and before David was born, Frieda Leszkowitz and her then-husband had a little boy, Barry, who unfortunately died when he was only 14 months old. They buried Barry in Queens and his parents reserved two plots for themselves in that same cemetery. Ms. Leszkowitz’s ex-husband (David and Shelly’s father) was buried in that cemetery.
More than 50 years later, and after Frieda’s ex-husband was already in that cemetery with Barry and before the two aides started to work for her, Frieda’s brother-in-law Eddie Lipiner (petitioner’s husband) died. Petitioner bought a plot for Eddie in Israel and at the same time petitioner bought a plot for herself, as did their daughter, Rena Katz, and her husband. Rena and petitioner testified that, at the time these plots were being purchased, Frieda said she wanted to be buried in Israel too, and she purchased a plot in the same cemetery so she could be buried with them when the time came.
David testified that he suspected (without any proof or investigation) that petitioner wrote the check for the plot in Israel from her joint account with his mother. Even if Ms. Lesz-kowitz did not write the check for the plot, there is still no doubt that, as her aides testified, Ms. Leszkowitz wanted to be buried in Israel.
As it became clearer that Ms. Leszkowitz’s death would be soon, petitioner left an envelope on a table in Ms. Leszkowitz’s apartment for David, who by that time was visiting more often. In the envelope was the information about the Israeli cemetery plot. David testified that he opened the envelope on July 10, 2016, a full nine days before his mother passed away. He saw a letter addressed to petitioner which described and confirmed the Israeli burial plot reserved for his mother.
*671 David claimed that after reading this letter, he spoke with his cousin Steven (petitioner’s son) and they determined that they would not discuss this letter with petitioner or the rest of the family. David’s decision to ignore the fact that his mother had a plot in Israel is inexcusable. He had a responsibility to at least attempt to ascertain his mother’s final wishes regarding her burial location. Even though his mother’s health was rapidly declining, David could have tried to communicate with her; he did not. He could have asked petitioner about it; he did not. David did absolutely nothing. David admitted he did nothing, despite knowing that his mother had a plot in Israel which was purchased after Eddie died in 2013.
On this issue, the testimony of Ms. Ward is compelling and instructive. She swore that she spoke to David about Ms. Lesz-kowitz’s wishes. Ms. Ward testified that she pleaded with David to put past grievances behind him and grant his mother’s wish to be buried in Israel rather than ignore his mother’s desire in order to spite his aunt. David did not deny that conversation took place.
David’s actions evidence a complete disinterest in ascertaining the location of his mother’s desired final resting place. To be competent under Public Health Law § 4201 (2) (b),[5] a person must express a willingness to fulfill the decedent’s wishes regarding the intended location of her burial. Implicit in that task is a requirement that a person perform a reasonable investigation, especially where that person has actual knowledge that there are conflicting views about the decedent’s wishes and two cemetery plots are reserved in the decedent’s name.
When confronted with new information about a possible desired burial in Israel, a competent person under the Public Health Law would have taken steps to ensure that the decedent’s wishes were fulfilled. Here, David should have, at the very least, tried to determine his mother’s wishes, either by asking his mother, his aunt or his mother’s aides. Although those conversations would certainly have been difficult and *672 emotional, they should have occurred under these circumstances. David’s failure to ask these questions renders him incompetent as the person tasked with carrying out the wishes of the deceased.
David’s conflicting testimony regarding petitioner further supports this conclusion. On one hand, David insists that petitioner manipulated his mother throughout her life and speculates that it is petitioner’s wish that Ms. Leszkowitz be buried in Israel rather than Ms. Leszkowitz’s wish. On the other hand, when questioned why he did not take steps to remove or even lessen petitioner’s influence in his mother’s life, David was unable to offer a response. He noted that petitioner had been quite helpful to his mother in many instances. David further testified that he managed the care for his mother, while living in Michigan, with the assistance of petitioner. If David had numerous conversations about the care of his mother with petitioner, then why couldn’t he discuss the existence of a burial plot in Israel with petitioner when petitioner left him the letter or when his mother passed away? David could have raised this issue; he simply made the startling decision to ignore it.
The court also finds that Shelly is incompetent under the Public Health Law because she admitted that she had no knowledge of Ms. Leszkowitz’s wishes and began an “investigation” regarding this issue only after the instant proceeding started. She merely deferred to her brother, who refused to address the issue of the plot in Israel. And while Shelly was passionate that her mother would not have wanted to be separated from Barry, the infant buried in Queens so long ago, Shelly admittedly had no idea of her mother’s feelings about that in the past 30 or 40 years. Shelly had no idea how often, if ever, her mother visited Barry’s grave or spoke about Barry. The cross-examination of the home health aides did not explore Ms. Leszkowitz’s feelings about being buried in Israel even though Barry was in Queens. As stated earlier, while Shelly may believe her mother would not have wanted to leave Barry in Queens with his father, there was no testimony about what Ms. Leszkowitz said about that.
When someone is unwilling or unable to carry out the wishes of the decedent, then the court must proceed to the next applicable person listed in Public Health Law § 4201 (2) (a) to carry out the decedent’s final burial wishes. Here, that person is petitioner, Lucy Lipiner.
*673 Conclusion
This disinterment proceeding comes as no surprise to David. This matter was originally initiated to prevent Ms. Leszkow-itz’s burial in Queens. Unfortunately, by the time the order to show cause granting a stay of the funeral was signed, Ms. Lesz-kowitz had already been buried. Petitioner then amended her petition to one for disinterment.[6]
The court finds that petitioner has met her burden and has shown a good and substantial reason to move decedent’s remains to Israel. Her two home health aides testified unequivocally that she was of sound mind and that she said she wanted to be buried in Israel; their cross-examination did not cause them to waiver at all and, in fact, only strengthened their credibility. There is nothing supporting the contention that Ms. Leszkowitz wanted to be buried near her ex-husband, from whom she was divorced, whom she referred to as a “bastard” and for whom she declined to care or join in Michigan after his stroke.
The evidence shows that Ms. Leszkowitz wanted to be buried in Israel and that David buried her in Queens without undertaking any inquiry into her wishes and actively ignoring evidence of a recently purchased plot in Israel. Ms. Leszkowitz did not want to spend eternity next to her ex-husband, “the bastard.” The evidence shows that she wanted to be in Israel, near her parents and next to her sister. This is a good and substantial reason to move Frieda Leszkowitz from Queens, a place where she did not want to be, to Israel, a place she wanted to rest for eternity.
Accordingly, it is hereby ordered that, as soon as possible, Ms. Frieda Leszkowitz’s remains shall be disinterred and flown to Israel where a funeral and burial shall take place in the Eretz Hachaim Cemetery in Jerusalem, Israel; and it is further ordered that petitioner shall obtain all necessary permits prior to such removal.

. It makes sense that Ms. Leszkowitz did not want to be buried near her ex-husband. He was living in New York when he had a stroke, and he was moved to Michigan (where his children were) to receive care. Ms. Leszkowitz, who was already retired by then, did not care for him in New York or move to Michigan to care or be with him. This decision was made even though she could have stayed in her daughter’s large home only minutes from the nursing facility. That she called him a “bastard” is entirely credible.

. At times during the hearing, respondents implied that Ms. Leszkowitz may have had dementia. However, respondents failed to establish that Ms. Leszkowitz was diagnosed with dementia. Ms. Ward and Ms. Houston claim they were unaware of this alleged diagnosis and testified that Ms. Leszkow-itz was capable of expressing her wishes and desires. Ms. Ward also testified that she has worked with dementia patients during her work as a home health aide and that Ms. Leszkowitz did not exhibit the symptoms of dementia. Further, even assuming that Ms. Leszkowitz did have dementia, respondents did not provide testimony to show that Ms. Leszkowitz’s dementia would have made it impossible for her to express her desire to be buried in Israel.

. Shelly testified at length even though she acknowledged that she never had a single conversation with her mother about where her mother wished to be buried.

. The court makes no finding regarding whether this conversation occurred. However, the court observes that David testified that his mother never discussed where she wanted to be buried and then failed to provide a reason for why David suddenly brought up such a sensitive topic in June 2015.

. As discussed in this court’s decision in this matter dated September 16, 2016 (53 Mise 3d 1080 [2016]), the parties provided no case law to suggest that the passage of Public Health Law § 4201 overturned over a century of precedent suggesting that the deceased’s wishes are paramount. Public Health Law § 4201 (2) (a) simply assigns a list of people who have the responsibility to carry out the deceased’s wishes rather than identify which person would decide, without addressing the decedent’s wishes, the disposition of a deceased’s remains.

. At the hearing, David claimed that his mother would never have wanted him to go through the pain of a disinterment. But neither did petitioner—she tried to stop the burial. Any pain could have been avoided if David had not ignored the existence of the Israeli burial plot.